UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------X
ADANJEANDEL SOSTRE,

                    Petitioner,

                                        **MEMORANDUM AND ORDER**

          -against-

                                        11-CV-3439 (KAM)
WILLIAM A. LEE, Superintendent,
Greenhaven Correctional Facility,

                    Respondent.
--------------------------------X

**MATSUMOTO, United States District Judge:**

          Petitioner Adanjeandel Sostre ("petitioner"), who is
currently serving a state-court sentence of twenty years to life
pursuant to a judgment of conviction imposed on May 2, 2007, by
the New York State Supreme Court in Kings County, seeks a writ
of habeas corpus pursuant to 28 U.S.C. § 2254.  (ECF No. 1,
Petition for Writ of Habeas Corpus ("Pet.") at 1.)
Specifically, petitioner asserts that the New York Supreme
Court's refusal to charge the lesser-included offense of first-
degree manslaughter deprived him of his due process right to a
fair trial in violation of the United States Constitution.
(Pet. at 3.)  For the reasons set forth below, the petition is
denied.

## BACKGROUND

### I.  Petitioner's Indictment

On December 23, 2005, petitioner was indicted by the State of New York ("the People") for the May 10, 2005, murder of Chase Brown ("Brown").  (*See* ECF No. 4, Affidavit in Opposition to Petition for a Writ of Habeas Corpus ("Gov't Opp.") at 2.) Petitioner was subsequently charged with Murder in the Second degree (N.Y. Penal Law § 125.25[1]), Criminal Possession of a Weapon in the Second degree (former N.Y. Penal Law § 265.03[2]), and Criminal Possession of a Weapon in the Third Degree (former N.Y. Penal Law § 265.02[4]).[1]  (Gov't Opp. at 2-3.)

### II.  Petitioner's Trial

Petitioner's trial commenced on March 13, 2007, at which the People elicited the following testimony.  Brian Irvin ("Irvin") testified that at around 4:00 p.m., on May 10, 2005, he received a phone call from his cousin and best friend, Chase Brown ("Brown").  (ECF Nos. 5, 4-1--5-5, Tr. of State Court Trial ("Tr.") at 212, 218, 220.)  After that call, Irvin travelled and met Brown near Brown's house on Linden Street in Bushwick, Brooklyn.  (*Id.* at 220.)  From Brown's house, the two men drove to Linden Park in Irvin's car, parked the car, entered the park, and walked onto a basketball court.  (*Id.* at 220-21,

---

[1]  Former N.Y. Penal Law § 265.03(2) is now codified at Penal Law § 265.03(1)(b). Former N.Y. Penal Law § 265.02(4) is now codified at Penal Law § 265.03(3).

233-34, 251.)  Irvin had had a physical altercation with petitioner about a week or two prior to May 10th.  (*Id.* at 216).

Oscar Ramos ("Ramos") was also in the park at the time. (*Id.* at 185.)  Ramos had grown up with Brown and also knew petitioner as "Tato." (*Id.* at 179-81.)  Earlier that day, at about 4:00 p.m., Ramos had seen petitioner, who told Ramos that he and Brown had had "a little fistfight," and that Brown had struck petitioner's female cousin in the face.  (*Id.* at 183-84.) Ramos had seen petitioner's cousin after the altercation, and described her face as bruised. (*Id.* at 184-85.)

Irvin saw petitioner, whom he referred to as "Tato," enter the park with about three other people walking behind him. (*Id.* at 213, 215, 222.)  Petitioner was wearing a grayish colored hoodie without the hood on his head, baggy jeans, and dirty white sneakers.  (*Id.* at 240-41.) Petitioner looked "like he wanted to fight."  (*Id.* at 222-23.)  Irvin previously lived down the block from petitioner and used to see him three or four times per week; however, they "were not friendly" and "did not associate."  (*Id.* at 213-15.)

Inside the park, both Ramos and Irvin saw Brown begin walking toward petitioner.  (*Id.* at 190, 223, 235.)  As Brown approached, Irvin heard petitioner say, "Oh, you thought I wasn't coming back?  This is what I came to do." (*Id.* at 225.) Then, according to Irvin, from a distance of about two to three

feet away, petitioner "raised a gun from his hip" and fired
three shots at Brown's torso. (*Id.* at 223, 225, 245, 248-49.)
Brown "fell to his knees." (*Id.* at 225.)  Then, with "his hands
up" and extended over his head, Brown "got back up." (*Id.* at
223, 225, 239-40, 245-46.)  Irvin could see from the expression
on Brown's face that Brown could not "retaliate" and "was in a
lot of pain." (*Id.* at 225-26.)  Nevertheless, petitioner
continued firing at Brown "from pointblank range." (*Id.* at 245.)

Brown then collapsed to the ground, at which point
petitioner "stood over him and shot him repeatedly." (*Id.* at
245-46.)  According to Irvin, who was standing about ten feet
away from petitioner at the time of the shooting and had an
unobstructed view of petitioner's face, petitioner fired in the
direction of Brown's torso. (*Id.* at 240, 224-225.)

Ramos also saw the shooting occur and testified that
he was standing approximately 100 feet behind the shooter and
heard four or five shots ring out, but did not see the shooter's
face. (*Id.* at 188-89.)  Ramos testified that the shooter was
wearing a red hat and had his back to him. (*Id.* at 189.)  Ramos
assumed, however, that petitioner was the shooter "because [of]
the situation that happened prior to that." (*Id.* at 185-86,
189).  As the shots rang out, everyone in the park began to
scatter. (*Id.* at 190-91.)

As petitioner "stood over [Brown] and kept shooting," Irvin ran out of the park, and returned to Brown only after seeing petitioner run out of the park. (*Id.* at 226-228, 238.)

Police Officers Jonathan King and Sean McClain of the New York City Police Department ("NYPD") 83rd Precinct responded to the park shooting at about 5:23 p.m. and found Brown lying face down and not moving on the basketball court. (*Id.* at 96-100, 192, 227-229.) Emergency Medical Services then transported Brown to Wycoff Hospital, where he was pronounced dead. (*Id.* at 33, 100, 229-30.)

Detective Mark Sandow ("Detective Sandow"), a member of the NYPD Crime Scene Unit, arrived at the park at approximately 7:15 p.m. (*Id.* at 34-37.) Detective Sandow recovered four .45 caliber spent shells, two complete .45 caliber cartridges, "a deformed piece of copper jacketing," and a "deformed piece of lead" from the crime scene. (*Id.* at 53, 56-60.) Detective Sandow gave the ballistics evidence to Police Officer Kevin Soogrim for vouchering. (*Id.* at 75-76, 110-11, 113-14.)

Several hours after the shooting on May 10th, Irvin spoke on the phone with a detective from the NYPD homicide bureau and gave the same account of the crime that he gave at trial. (*Id.* at 230-31, 242.)

On May 11, 2005, Doctor Floriana Persechino ("Doctor Persechino"), a medical examiner and expert in forensic pathology, performed an autopsy on Brown's body. (*Id.* at 163-67.) The autopsy revealed that the victim had sustained four gunshot wounds: one to the left side of the chest, which pierced the heart and continued through the right lung; one to the lower right chest, which pierced the liver, small bowel, pancreas, and aorta; one to the left forearm; and one to the right thigh. (*Id.* at 163-69, 171-72.) Doctor Persechino certified that the penetrating wounds to the torso caused Brown's death. (*Id.* at 174.)

Detective Louis Fontanez ("Detective Fontanez"), a ballistic expert, determined that all four casings recovered from the crime scene were ejected from the same gun. (*Id.* at 102, 111.) Detective Fontanez also determined that two bullets recovered from Brown's body originated from the same gun. (*Id.* at 119.)

On the basis of eye-witness accounts of the shooting, Detective Matthew Prial searched for petitioner from May 11, 2005, until December 2, 2005, at which time he found petitioner at a friend's home in Brooklyn and arrested him. (*See id.* at 132-34, 155.)

On December 2, 2005, Ramos viewed a lineup that contained petitioner, and positively identified petitioner. (*Id.*

at 134-35, 193.)  Later that day, petitioner waived his Miranda rights and gave oral statements to detectives.  (*Id.* at 139-40, 142-46, 254-255.)

Petitioner stated, *inter alia*, that on May 10th, Brown had previously hit him as he was coming home from work; that Brown also hit his cousin in her face, requiring her to receive eight stitches; that petitioner did not fight back because Brown was "too big"; and that petitioner went to the park knowing Brown was there, but that petitioner "wasn't worried."  (*Id.* at 144-45, 147.)  Petitioner admitted to being at the park during the shooting, but claimed that he was not involved, and that a Puerto Rican named "S" had shot Brown. (*Id.* at 144-45, 147-48.) Petitioner later gave essentially the same account, in relevant part, in a videotaped statement taken by Assistant District Attorney Alfred DeinGeniis.  (*Id.* at 150, 159-60, 258.)

Petitioner did not present any witnesses or evidence on his own behalf. (*Id.* at 262.)

### A. Verdict and Sentencing

At the close of the People's case, the trial court submitted an instruction for second-degree murder to the jury. (*Id.* at 263-265.)  A person is guilty of murder in the second degree when, with intent to cause the death of another person, he causes the death of such person.  N.Y. Penal Law § 125.25. During the charging conference, petitioner requested that the

court also charge the jury on first-degree manslaughter, the lesser-included offense of second-degree murder, on the ground that the jury could find that petitioner did not intend to kill Brown given the petitioner's heightened emotions following the fight that occurred prior to the shooting. (Tr. at 264.) A person is guilty of manslaughter in the first degree when, with intent to cause serious physical injury to another person, he causes the death of such person or of a third person. N.Y. Penal Law § 125.20. The court denied the request, finding that the four shots fired at close range indicated there was no possibility of anything other than petitioner's intent to kill Brown. (Tr. at 264-65.) Petitioner was subsequently convicted by the jury of murder in the second degree. (*Id*. at 320.)

On May 2, 2007, the court sentenced petitioner to twenty years to life imprisonment. (ECF No. 5, Sentencing Tr. at 8.)

### III. Post-Conviction Proceedings in State Court

Petitioner appealed his conviction to the Appellate Division of the New York State Supreme Court, Second Department ("Appellate Division"), contending that the trial court erred in denying his request to charge the jury with manslaughter in the first degree as a lesser-included offense, arguing that the jury reasonably could have concluded that petitioner intended to cause serious physical injury but not death. *People v. Sostre*,

70 A.D.3d 865 (N.Y. App. Div. 2d Dept. 2010). On February 9,
2010, the Appellate Division denied petitioner's appeal. *Id.* at
865. Viewing the evidence in the light most favorable to
petitioner, the court found that there was no reasonable view of
the evidence to support a finding that the petitioner intended
to cause serious physical injury but not death. *Id.* at 865.
The Appellate Division cited to "evidence adduced at trial that
[petitioner], at a distance of two or three feet, fired four
shots into Chase's body, two of them into his chest, piercing
the heart and liver." *Id.* at 865.

Petitioner sought leave to appeal to the New York
Court of Appeals on the same grounds, and on April 21, 2010, the
Court of Appeals denied petitioner a further appeal. *People v.
Sostre*, 901 N.Y.S.2d 151 (2010).

## IV. The Instant Habeas Petition

On July 8, 2011, petitioner filed the instant habeas
petition, claiming that the state trial court's refusal to
charge the lesser-included offense of first-degree manslaughter
deprived him of his due process right to a fair trial. (Petition
for Writ of Habeas Corpus ("Pet.") at 3.) Petitioner claims
that a reasonable view of the evidence shows that he fired a
number of shots haphazardly, and that the relative lack of
execution-style wounds at close range reasonably supports a
finding that the petitioner demonstrated intent to shoot the

victim, but not an intent to kill him, thereby rendering the state court's decision erroneous.  (*Id.* at 6.)

Petitioner seeks to have his conviction reversed and remanded for a new trial, or to be released from state custody. (*Id.* at 15.)  The People oppose petitioner's claim for habeas relief, arguing that petitioner's claim that the trial court erroneously refused to charge the jury with a lesser-included offense is not cognizable in a federal habeas proceeding, and that even if it were, petitioner's claim is without merit. (*See* Gov't Opp. at 5.)

## **STANDARD OF REVIEW**

A Section 2254 habeas petition shall not be granted unless the petitioner "has exhausted the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1)(A); *see also O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) ("[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.")  A habeas petitioner's state remedies are considered exhausted when the petitioner has: "(i) presented the federal constitutional claim asserted in the petition to the highest state court (after preserving it as required by state law in lower courts) and (ii) informed that court (and lower courts) about both the factual and legal bases for the federal claim."  *Ramirez v. Attorney*

*Gen. of N.Y.*, 280 F.3d 87, 94 (2d Cir. 2001); *see also Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994) ("To fulfill the exhaustion requirement, a petitioner must have presented the substance of his federal claims to the highest court of the pertinent state." (internal quotation marks and citation omitted)).

Where a claim has been exhausted, the state court's adjudication on the merits is entitled to deference on collateral review, *Channer v. Brooks*, 320 F.3d 188, 195 (2d Cir. 2003); thus, a federal court may only grant habeas relief where the state court's adjudication of the federal claim resulted in a decision that was either: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000) (O'Connor, J., delivering the opinion of the Court as to Part II). A state

court decision is an "unreasonable application" of federal law "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* The Supreme Court has emphasized that the reasonableness of the application of federal law is to be assessed objectively rather than subjectively. *Id.* at 409-10. This question of whether a state court bases a decision on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2), is not a question of whether the federal court reviewing the record on a habeas petition agrees with the state court's findings, but only whether those findings are reasonable. *Channer*, 320 F.3d at 195. Thus, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 411.

## DISCUSSION

Here, there is no dispute as to whether the petitioner has exhausted his claim in state court. (*See generally* Gov't Opp. at 3-5.) Accordingly, the court need only determine whether, as the petitioner asserts, the state court's refusal to

charge the lesser-included offense of manslaughter in the first degree deprived him of his due process right to a fair trial.

To prevail on his habeas petition, petitioner must establish that the trial court's refusal to charge the lesser-included offense was (1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, pursuant to 28 U.S.C. § 2254(d)(1), or (2) resulted in a decision that was based on an unreasonable determination in light of the evidence presented in the state court proceeding, pursuant to 28 U.S.C. § 2254(d)(2).

As discussed below, the court finds that petitioner's claim is not cognizable under 28 U.S.C. § 2254, and that even if it were, the claim is without merit. Petitioner's request for habeas corpus relief is therefore denied.

## V. Petitioner's Claim is Not Cognizable Under 28 U.S.C. § 2254

Petitioner's claim is not cognizable under 28 U.S.C. § 2254. Under Section 2254, a federal court may not issue a writ of habeas corpus to a state prisoner on the basis of a claim that was adjudicated on the merits in state court proceedings unless (1) the adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States under 28 U.S.C. § 2254(d)(1);
or (2) resulted in a decision that was based on an unreasonable
determination in light of the facts in light of the evidence
presented in the state court proceeding under 28 U.S.C. §
2254(d)(2).

"Under 28 U.S.C. § 2254(d)(1), a federal habeas court
may grant relief if the state court (1) arrives at a conclusion
opposite to that reached by the [Supreme Court] on a question of
law, or (2) decides a case differently than the Supreme Court on
a set of materially indistinguishable facts." *Williams v.
Taylor*, 529 U.S. 362, 412-13 (2000).

Although the Supreme Court has held that due process
requires a trial court to submit jury instructions on lesser-
included offenses in capital cases if the evidence warrants the
charge, *Beck v. Alabama*, 447 U.S. 625, 637-38 (1980), neither
the Supreme Court nor the Second Circuit has decided whether the
failure to instruct the jury on lesser-included offenses in non-
capital cases is a constitutional issue that may be considered
on a habeas petition, *see Knapp v. Leonardo,* 46 F.3d 170, 179
(2d Cir. 1995) (specifically noting that the Second Circuit has
not decided the issue).

Further, in *Teague v. Lane*, the Supreme Court found
that "habeas corpus cannot be used as a vehicle to create new
constitutional rules of criminal procedure." 489 U.S. 288, 316

14

(1989).  Accordingly, in *Jones v. Hoffman*, the Second Circuit
held that because a decision interpreting the Constitution to
require the submission of instructions on lesser-included
offenses in non-capital cases would involve the announcement of
a new constitutional rule, *Teague* precluded consideration of
that issue under habeas corpus review.  86 F.3d 46, 48 (2d Cir.
1996).  Thus, "in the [Second Circuit], habeas review of a state
trial court's failure to instruct on lesser-included offenses in
noncapital cases is precluded."  *Franklin v. Ercole*, No. 06-CV-
700, 2009 WL 763417, at *13 (E.D.N.Y. Mar. 19, 2009); *see also*
*Rasmussen v. Kupec*, 54 Fed. App'x 518, 519 (2d Cir. 2003)
(citing *Jones*, 86 F.3d at 48); *Bien v. Smith*, 546 F. Supp. 2d.
26, 42-43 (E.D.N.Y. 2008) (finding petitioner's claim not
cognizable where petitioner challenged the trial court's refusal
to charge manslaughter in the first degree as a lesser-included
offense of murder in the second degree); *Maldonado v. West*, No.
05-CV-3132, 2007 WL 188684, at *6 (E.D.N.Y. Jan. 22, 2007)
(noting that "the effect of *Knapp* and *Jones* is to preclude
habeas review of a state trial court's failure to instruct on
lesser-included offenses in noncapital cases").

     The present case involves non-capital offenses, as
petitioner was sentenced to 20 years to life for the crime of
murder in the second degree.  (ECF No. 4, Sent. Hrg. Tr. at 8.)
Because consideration of failure to instruct on a lesser-

included offense for a non-capital crime would "involve the announcement of a new rule, *Teague* precludes consideration of the issue under Habeas Corpus review." *Jones*, 86 F.3d at 48; *see also Smith*, 546 F.Supp. at 42-43 (refusing to consider petitioner's habeas claim on failure to charge lesser offense for non-capital offense).

Therefore, petitioner's claim based on the trial court's refusal to instruct on the lesser-included offense of first-degree manslaughter is precluded from habeas review under 28 U.S.C. § 2254(d)(1).

## II. The Trial Court Reasonably Refused to Charge the Lesser-Included Offense of Manslaughter in the First Degree

Assuming, *arguendo*, that petitioner's claim was cognizable under 28 U.S.C. § 2254, petitioner was nonetheless not entitled to the lesser-included instruction for manslaughter in the first degree. Petitioner cannot establish that he was entitled to an instruction of the lesser offense because no reasonable view of the evidence supports a finding that petitioner committed manslaughter in the first degree rather than murder in the second degree.

Under the "unreasonable application clause" of 28 U.S.C. § 2254(d)(2), a federal court may grant habeas relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that

principle to the facts of the prisoner's case. *Williams*, 529
U.S. at 409. In determining what qualifies as an "unreasonable
application of clearly established Federal Law," the district
court should ask whether the state court's application of
clearly established federal law was objectively unreasonable.
*Id.* The phrase "clearly established Federal law, as determined
by this Court" refers to the holdings, as opposed to the *dicta*,
of the Supreme Court's decisions as of the time of the relevant
state court decision. *Id.* at 365.

A trial judge must charge the jury on lesser-included
offenses when (1) it is theoretically impossible to commit the
greater crime without committing the lesser, and (2) a
reasonable view of the evidence would permit the jury to find
that the defendant had committed the lesser, but not the greater
offense. *Rice v. Hoke*, 846 F.2d 160, 165 (2d Cir. 1988).

A person is guilty of murder in the second degree
when, with intent to cause the death of another person, he
causes the death of such person. N.Y. Penal Law § 125.25. A
person is guilty of manslaughter in the first degree when, with
intent to cause serious physical injury to another person, he
causes the death of such person or of a third person. N.Y.
Penal Law § 125.20. The significant difference between the two
charges is the mental state of the defendant; specifically,
whether the defendant intends to cause "serious physical injury"

or "death."  *See Moreno v. Kirkpatrick*, No. 06-CV-2136, 2010 WL
1223121, at *3 (E.D.N.Y. Mar. 23, 2010).

Petitioner satisfies the first element of the analysis
under *Rice* because it is theoretically impossible to commit
murder in the second degree, which requires intent to cause
death, without also committing manslaughter in the first degree,
which merely requires intent to cause serious physical harm.
*See Rice*, 846 F.2d at 165; *Moreno*, 2010 WL 1223121, at *3.  It
is theoretically impossible to commit murder in the second
degree without committing manslaughter in the first degree
because "intent to cause death," the mental requirement of
murder in the second degree under N.Y. Penal Law § 125.25,
implies that one also intends to "cause serious physical
injury," the requisite mental state for manslaughter in the
first degree under N.Y. Penal Law § 125.20.  Both offenses
require the same ultimate result – causing the death of another.

Although petitioner satisfies the first element, the
lesser-included charge of first-degree manslaughter fails the
second element under *Rice*: that a reasonable view of the
evidence would permit the jury to find that the defendant had
committed the lesser, but not the greater, offense.  *Rice*, 846
F.2d at 165.  Eyewitness testimony indicated that petitioner
fired at least four shots at the victim from a distance of two
to three feet, two of which hit the victim in the chest.  (Tr.

at 223.)  On appeal, viewing the evidence in the light most favorable to the defendant, the appellate division found there was no reasonable evidence to support a finding that the defendant intended to cause serious physical injury to Brown rather than kill him.  *Sostre*, 70 A.D. 3d at 865.

Petitioner's case is similar to numerous cases where reviewing courts have found trial judges' refusals to submit lesser-included offense instructions for murder in the second degree reasonable, and therefore dismissed habeas petitions made on those grounds.  *See, e.g.*, *Moreno*, 2010 WL 1223121, at *5 (finding trial court reasonably refused to instruct jury on lesser-included offense where petitioner pointed and fired gun at such vital areas as the neck and chest, suggesting that he intended to cause death, not serious physical injury); *see also Franklin*, 2009 WL 763417, at *13 (finding trial court's refusal to charge the lesser-included offense reasonable where eyewitness testified that petitioner stabbed victim three or four times in the stomach area and then hit the victim in the upper neck and shoulder area with a pipe, because no reasonable view of the evidence would permit the jury to find that petitioner acted negligently, recklessly, or with the intent only to cause serious physical injury, rather than with intent to cause death).

Similar to *Franklin*, in the present case, petitioner delivered injuries to Brown's stomach / chest region from an extremely close range, suggesting an intent to cause death, rather than mere serious physical injury. *Franklin*, 2009 WL 763417, at *13. Furthermore, as in *Moreno*, the close distance from which petitioner fired at Brown also indicates petitioner's intent to cause death, rather than serious physical injury. *Moreno*, 2010 WL 1223121, at *5. According to eyewitness testimony, petitioner fired multiple gunshots at Brown from a distance of two or three feet. (Tr. at 223.) Petitioner's having fired at least four shots into Brown also suggests his intent to kill rather than injure. *See Franklin*, 2009 WL 763417, at *13 (no requirement to instruct on lesser-included offense of first-degree manslaughter where defendant stabbed victim in the stomach multiple times). Accordingly, no reasonable view of the evidence would permit a jury to find that petitioner intended to cause mere serious physical injury to Brown rather than death.

Under 28 U.S.C. § 2254, petitioner was not deprived of due process when the trial judge refused to instruct the jury on the lesser-included offense of manslaughter. Therefore, the petition for writ of habeas corpus is denied.

## CONCLUSION

For the foregoing reasons, the application for a writ of habeas corpus is denied in its entirety. Because petitioner has not made a substantial showing of the denial of any constitutional right, the court will not issue a certificate of appealability. 28 U.S.C. § 2253; *Lozada v. United States*, 107 F.3d 1011, 1017 (2d Cir. 1997) (abrogated on other grounds); *see also Richardson v. Greene*, 497 F.3d 212, 217 (2d. Cir. 2007) (discussing the standard for issuing a certificate of appealability). Further, the court certifies, pursuant to 28 U.S.C. § 1915(a), that any appeal from this judgment denying the petition would not be taken in good faith. *See Coppedge v. United States*, 369 U.S. 438 (1962). The Clerk of the Court is respectfully requested to enter judgment in favor of respondent, close this case, serve a copy of this Memorandum and Order upon petitioner along with an appeals packet, and make a notation of service on the docket no later than July 16, 2013.

**SO ORDERED.**

Dated:     Brooklyn, New York
           July 15, 2013

                              _____/s/_____
                              KIYO A. MATSUMOTO
                              United States District Judge